**IN THE U.S. DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF ILLINOIS
EAST ST. LOUIS DIVISION**

SELECT REHABILITATION, LLC,

       Plaintiff,

  vs.

ERIK D. PAINTER, PAUL VAZQUEZ and
EMPOWERME REHABILITATION IL,
LLC,

      Defendants.

No.

**VERIFIED COMPLAINT FOR PRELIMINARY INJUNCTION,
PERMANENT INJUNCTIVE RELIEF, DAMAGES AND OTHER RELIF FOR BREACH
OF NON-SOLICITATION COVENANT AND MISAPPROPRIATION OF
TRADE SECRETS**

     Plaintiff Select Rehabilitation LLC ("Select"), as its Verified Complaint for Injunctive

and Other Relief against  Defendants Erik D. Painter ("Painter"),  Paula Vazquez ("Vazquez")

and EmpowerMe Rehabilitation IL, LLC ("EmpowerMe"), states:

**NATURE OF ACTION**

     1.    Painter is a former employee of Select's predecessor, RehabCare Group, Inc.

("RehabCare").  Vazquez is a former employee of both RehabCare and Select. Painter and

Vazquez now work for Select's direct competitor, EmpowerMe.  This an action by Select to redress

and/or enjoin: (a) Painter's breach of his fiduciary duties to RehabCare; (b) Painter's breach of his

employee non-solicitation agreement with RehabCare/Select; (c) Vazquez and EmpowerMe's

actual and threatened misappropriation of Select's trade secrets under the Defend Trade Secrets

Act, 18 U.S.C. § 1836 *et seq.* ("DTSA") and the Illinois Trade Secrets Act, 735 ILCS 1065/1 *et

seq.* (the "ITSA"); and (d) Vazquez's violation of the Computer Fraud and Abuse Act, 18 U.S.C.

§1030(a)(1) *et seq.* ("CFAA").

**PARTIES**

2.      Select is a Delaware Limited Liability Company with its principal place of business located at 2600 Compass Road, Glenview, Illinois, 60026.  Select provides therapy services, including physical therapy ("PT"), occupational therapy ("OT"), and speech and language therapy ("ST"), to patients who reside in assisted living and independent living facilities throughout the United States.

3.      Defendant Erik Painter is an individual residing at 113 Pamela Dr., Belleville, Illinois, 62223.

4.      Defendant Paula Vazquez is an individual residing at 931 Stone Creek Ln, Belleville, Illinois, 62223.

5.      Defendant EmpowerMe is an Illinois limited liability company with its principal place of business at 7730 Carondelet Avenue, Suite 400, Clayton, Missouri, 63105.  EmpowerMe does business in Illinois under the assumed name "EmpowerMe Wellness." EmpowerMe is a direct competitor of Select with respect to therapy services in Illinois and at least seven other states, Kentucky, Missouri, Kansas, Nebraska, Oklahoma, Georgia and Florida.

I.      **JURISDICTION AND VENUE**

6.      This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §1331 (Federal Question) because DTSA and CFAA are federal statutes that Vazquez and/or Defendants violated. The remaining state law claims arise out of the same operative facts as these federal violations,  making it appropriate for the Court to exercise supplemental jurisdiction over them pursuant to 28  U.S.C §1367.

7.      Venue is proper in this Court pursuant to 28 U.S.C. §1391(b), in that individual Defendants reside in this Judicial District, EmpowerMe does business in and is subject to personal jurisdiction in this District, and the Defendants committed tortious acts in this District.

## II.   FACTS COMMON TO ALL COUNTS

### A.   Select Holds The Rights Of RehabCare

8.      On November 30, 2020, Select acquired RehabCare (a provider of physical, occupational and speech therapy services) through an equity purchase transaction, and as of right, holds all of the contractual and other rights of RehabCare at issue in this lawsuit.[1]

### B.   Painter's Key Role at and Non-Solicitation Agreement With RehabCare/Select

9.      At the time he left RehabCare's employ, Defendant Painter was  a Senior Director for Community Relations ("Senior Director").   As such, Painter was responsible for all of RehabCare's regulatory compliance, including  meeting the Center for Medicare and Medicaid Services' ("CMS") critical provider and licensure requirements, which allowed RehabCare to provide reimbursable care to the beneficiaries of those programs.

10.     In his Senior Director role, Painter had access to the RehabCare financial statements corresponding to the facilities[2] at which RehabCare provided the Services, including profitability by facility. Painter had much the same access to RehabCare's personnel and financial information in his prior role RehabCare's Director of Operations.

---

[1] For purposes of convenience, because Select has all of RehabCare prior rights relating to the issues in this Complaint, Select sometimes uses the term RehabCare/Select.

[2] RehabCare/Select does not own or operate these third-party facilities, but rather is permitted to provide Services in them per "Access Agreements" with the facility owner.  Generally speaking, the individual patients within the facilities (or their families), select their own therapy providers, though the facilities can play a role in that selection process.

11.     As Senior Director, Painter was frequently on site at the various facilities across the country at which RehabCare provided the Services,  working closely with RehabCare's (now Select's) Agency Administrators.  Painter also hosted monthly compliance meetings with the Agency Administrators regarding what they and other employees needed to be doing to maintain CMS licensure/provider status with respect to patients and facilities in their area.

12.     The Agency Administrators, in addition to furthering compliance locally as set forth above, were responsible for: (a) RehabCare/Select's general Services and therapists at facilities within a geographic location; (b) developing relationships with facility managers and adding new sites at which RehabCare/Select could provide the Services;  (c) supervising Agency Coordinators; and (d) maintaining RehabCare/Select's patient data and medical records.

13.     The Agency Administrators were and are RehabCare/Select's main point of contact with the decision-makers at each of the facilities at which RehabCare/Select provides the Service.[3] They are also intimately familiar with RehabCare/Select's professional staff in the market, the permissible compensation ranges for such staff, and RehabCare/Select's costs, revenue and profitability at each facility within their purview, all of which constitutes confidential and proprietary information unknown to its competitors.

14.     RehabCare/Select invests heavily in its Agency Administrators.  RehabCare/Select, including training on compliance, operational and business development.

15.     Due to the importance of his role and his access to personnel and information as aforesaid, Painter in March of 2006 executed and entered into an Employee Confidentiality and Non-Solicitation Agreement with RehabCare (the "Non-Solicitation Agreement"), a true and

---

[3] The exception to this general rule would be facilities that were part of a multi-location group; executives above the Agency Administrator role would be primarily responsible for RehabCare/Select's relationships with multi-facility groups.

correct copy of which is attached hereto as Exhibit 1. RehabCare gave Painter valuable consideration in exchange for signing the Non-Solicitation Agreement, including but not limited to continued employment and bonus eligibility.

16.     The Non-Solicitation Agreement, in relevant part, prohibits Painter's solicitation of managerial or supervisory employees of RehabCare, whether during the term of his employment or the one-year period thereafter:

> 4. (b) During the term of Employee's [Painter's] employment with RehabCare, and for a period of one (1) year after such employment terminates, regardless of the reason, Employee shall not directly or indirectly… engage in any of the following activities…
>
> ***
>
> (iv) solicit the employment of, recruit, employ, hire, cause to be employed or hired, entice away, or establish a business with, any then current officer, manager, or other employee or agent of RehabCare (other than non-supervisory or non-managerial personnel who are employed in a clerical or maintenance position or otherwise have not signed any agreement of a type which is the same as or similar to this Agreement) … , or suggest to or discuss with any such employee the discontinuation of that person's status with RehabCare, or such person's employment or participation in any activity in competition with RehabCare; or
>
> (v) Assist any person, firm, entity, employer, business associate or member of Employee's family to commit any of the foregoing acts, directly or indirectly.

(Ex. 1 at ¶4(b)).

17.     This prohibition on employee solicitation inures to the benefit of RehabCare's successors or assigns, including Select. *Id.* at ¶7.

18.     In the Non-Solicitation Agreement, Painter expressly acknowledged that the referenced restrictions "protect legitimate interests of RehabCare with respect to its trade secrets, confidential information and customers, customer relationships, and other employees of

RehabCare; that such restrictions are reasonable and necessary to protect RehabCare's lawful interests, and do not impair or prevent Employee [Painter] from earning a living." *Id.*

19.     Furthermore, Painter's restrictive covenants applied post-employment, without regard to any change in the terms and conditions of his employment or which party ended the employment relationship. *Id.* at  ¶5.

20.     The Non-Solicitation Agreement also provides that its non-solicitation obligations will be extended by the length of time during which Painter was in breach of them. *Id.* at ¶4(b).

**C.      Painter Solicits RehabCare/Select Employees--In Direct Violation Of His Fiduciary Duties and the Non-Solicitation Agreement—Causing Employees To Leave for its Competitor, EmpowerMe**

21.     Painter's last day of  employment with RehabCare was on November 30, 2020.

22.     The restrictive covenants in Painter's Non-Solicitation Agreement run for at least one year after that date, i.e. until at least November 30, 2021, and thus were in force at the time of his conduct below.   *Id.* at ¶4.

23.     Sometime prior to November 25, 2020, Painter accepted a position with EmpowerMe, another provider of the Services and a direct competitor of both RehabCare and Select.  Painter is today employed by EmpowerMe as its Regional Vice President for Operations for the Greater St. Louis Area.

24.     Beginning on or about November 25, 2020, while still employed by RehabCare, Painter began soliciting its employees to leave RehabCare/Select and work for EmpowerMe in violation of paragraph 4(b) of the Non-Solicitation Agreement.

25.     Painter's unlawful solicitations included but were not limited to two managerial employees falling within the scope of his Non-Solicitation Agreement, Jami Ann Greuenloh ("Gruenloh"), one of Painter's former subordinates at RehabCare, and Regina Miller ("Miller").

Both Gruenloh and Miller were Agency Administrators at the time of Painter's solicitations, set forth in more detail below.

### Painter's Solicitation of Regina Miller

26.     Specifically, on November 25, 2020, Painter spoke with Miller, with whom he had worked for the past 18 years, by telephone and told her he was going to accept a position with EmpowerMe. Painter told Miller that his role at EmpowerMe would be similar to what it was at RehabCare, but did not tell her what his official title would be.

27.     During the same conversation, Painter told Miller that EmpowerMe was also interested in talking to her about employment. On information and belief, EmpowerMe was interested in employing Miller in large part because of what Painter had told EmpowerMe about Miller's skill and experience, including but not limited to her prior experience as Agency Administrator and Staffing Coordinator at RehabCare/Select.

28.     On November 30, 2020, Painter asked Miller to send him her resume to his personal email address, which she did soon thereafter. Thereafter, Painter helped organize EmpowerMe's interview of Miller.

29.     On December 3, 2020, Painter informed Miller of the time, date and location of her EmpowerMe interview. He further informed Miller that he would be attend the interview along with Lisa Meyer ("Meyer"), a former RehabCare employee and EmpowerMe's Senior Vice President of Operations, and Josh Stevens ("Stevens"), RehabCare's owner. A copy of Painter's text to Miller in that regard is attached as Exhibit 2.

30.     Notably, Painter also told Miller that her ability to identify and obtain new employees for EmpowerMe was something that it wanted to discuss at the interview. *Id.*

31.     Painter in fact personally attended Miller's interview with EmpowerMe, along with Meyer and Stevens. The interview lasted approximately 1.5 hours. At its conclusion, EmpowerMe offered Miller a position.

32.     As she was leaving her interview with EmpowerMe, Miller saw Gruenloh waiting to go in for her interview and said hello to her.

33.     Miller accepted EmpowerMe's offer the following Monday, December 6, 2020.

34.     Miller gave Select notice of her resignation on December 7, 2020, effective for a later date, and continued to work.

35.     Shortly thereafter, Miller expressed some reservations to Painter about leaving RehabCare/Select due to her personal relationships with the people there.  Painter tried to assuage her, reminding her that EmpowerMe would grow quickly ***and bring all of RehabCare/Select's best employees with them***.

36.     On December 9, 2020, Painter indicated to Miller that he was making a list of other RehabCare/Select employees to hire for EmpowerMe.

37.     On December 15, 2020, however, Miller told Painter  that she had changed her mind and decided to stay with Select.

**Painter's Solicitation of Jami Ann Gruenloh**

38.     As he had done with Miller, Painter solicited Gruenloh to join EmpowerMe while still employed.

39.     As with Miller, Painter helped organize and participated in Gruenloh's interview with EmpowerMe. Specifically, EmpowerMe interviewed Gruenloh on December 4, 2020, immediately after Miller's interview.  Again, Painter,  Meyer and Stevens were present at Gruenloh's interview.

40.     Not long after the EmpowerMe interview, Gruenloh accepted EmpowerMe's offer of employment.

41.     On or about December 8, 2020, Gruenloh gave Select notice of her resignation, to be effective January 8, 2021. Select, however, formally terminated her on or about December 22, 2020, the same day it discovered Vazquez's conduct described below.

42.     EmpowerMe is now employing Gruenloh in a similar position to that she held with RehabCare/Select, Agency Administrator; specifically, Gruenloh is an Area Rehab Director overseeing EmpowerMe's assisted living facilities in Illinois. .

**Painter's Solicitation of Paula Vazquez**

43.     Vazquez was a Staffing Coordinator at RehabCare/Select from approximately January of 2019 to December 15, 2020.  In that role, she was responsible for therapist staffing and recruiting, including in the "direct billing" settings referenced above.

44.     In her position, Vazquez also had access to certain confidential, commercially valuable information of RehabCare/Select, including but not limited to: (a) rosters of its therapists, full-time, part-time and per diem (also called "PRN"), which include their names, addresses, phone numbers and the facility to which they were assigned; and (b) the average, minimum and maximum wage rates RehabCare/Select currently paid its various therapists.

45.     Unbeknownst to RehabCare/Select, Painter had first solicited Vazquez to work for EmpowerMe sometime in early November of 2020. Vazquez later admitted to Pennington that Painter had successfully solicited her for employment with EmpowerMe, but that she was not supposed to let Select know this.

46.     Vazquez gave Select email notice of her resignation on December 6, 2020, effective, December 25, 2020. Select, however, terminated Vazquez on December 15, 2020.

47.     On December 7, 2020, in a conversation with a Select's Divisional Vice President, Sherrie Sharp ("Sharp"), Painter admitted  soliciting these three employees, but asserted that he had a right to do so because the Non-Solicitation Agreement was with RehabCare and not Select. As set forth above, Painter's assertion is erroneous.

##### D.      Vazquez Misappropriates RehabCare/Select's Trade Secrets before Leaving

48.     On or about December 15, 2020, Select learned that Vazquez had misappropriated its confidential and proprietary information on at least two occasions prior to giving Select notice of her resignation on December 6, 2020; she did so by accessing the information from RehabCare/Select's computer systems and then transferring it to her personal email address, almost certainly in anticipation of her imminent employment at EmpowerMe.

49.     The first such occasion was on or about November 11, 2020. At that time, Vazquez accessed RehabCare/Select's personnel information and copied a list of 32 RehabCare/Select therapists available to supply PRN  services to patients at various facilities throughout Illinois (the "PRN List").[4]  The PRN List included each therapist's name, job title, phone number, address and the facility at which each worked.

50.     Vazquez then sent the PRN List sent to her personal email address on November 11, 2020, in contravention of various RehabCare/Select policies.

51.     As set forth above, Painter admitted to Miller that one of the reasons EmpowerMe was interested in employing her was because her knowledge of and access to its therapist employees.

---

[4] Select does not attach copies of the documents and information Vazquez misappropriated as this would reveal the trade secrets Select is trying to protect. At the pleadings stage, a plaintiff can describe trade secret information in general terms. *General Electric Co. v. Uptake Technologies, Inc*., 394 F. Supp.3d at 831 (N.D. Ill. 2019); *AutoMed Techs., Inc. v. Eller*, 160 F. Supp.2d 915, 920-21 (N.D. Ill. 2001).

52.     In fact, in many markets, including rural markets, finding therapists for staffing is difficult because of their limited supply.  Moreover,  "direct bill" facilities do not typically have exclusive arrangements with one therapy provider; on the contrary, the patient has the right to decide which therapists it wants to utilize, though again the facility can play a significant role in this decision.  For this reason, a competitor's access to RehabCare/Select's existing roster of therapy employees by facility is a good way to get access to the patients and  revenue stream associated with those facilities.

53.     The second, but related, occasion of misappropriation occurred on December 5, 2020, the day before Vazquez gave Select email notice of her resignation. On that date, Vazquez sent an email from her Select account to her personal email address attaching  a group of excel spreadsheets entitled "Paula Rates," again in contravention of various RehabCare/Select policies.

54.     Vazquez created these spreadsheets from the highly confidential average, minimum and maximum compensation rates RehabCare/Select used with its full-time, PRN and part-time certified occupational therapist assistants, occupational therapists, physical therapists, physical therapist assistants and speech and language pathologists  in the States of Illinois, Kentucky, Missouri, Kansas, Nebraska, Oklahoma, North Carolina, Georgia and Florida (the "Compensation Information").  Vazquez accessed this Compensation Information from RehabCare/Select's computer systems and downloaded it into the spreadsheets before emailing it to herself.

55.     RehabCare/Select uses the Compensation Information to  make initial employment offers and set subsequent compensation rates in the aforesaid therapy disciplines in the states listed.

56.     As a set forth above, Vazquez had direct access to and helped aggregate the Compensation Information in order to help RehabCare/Select hire employees throughout the country.

57.     The "Paula Rates" spreadsheets Vazquez created with the Compensation Information, however, also refer to "EmpowerMe ytd 2021" and include a column entitled "Josh rates" for each of the same disciplines.   On information and belief, this is a reference to EmpowerMe's rates for the same therapy positions,  presumably obtained from Josh Stevens, its owner.[5]

58.     In other words, while still employed, Vazquez used RehabCare/Select's Compensation Information to create a side-by-side comparison of RehabCare/Select's and EmpowerMe's respective compensation ranges for the same therapy employees in the same geographic areas, and then absconded with it.

59.     Vazquez misappropriated the PRN List and Confidential Information to help EmpowerMe solicit and hire away Select's PRN and other therapy employees in the states listed, and ultimately take those therapists' patients and the revenue streams associated therewith.  The PRN List not only identifies specific RehabCare/Select therapy employees, their contact information and facilities, but the "Paula Rates" spreadsheets effectively identify the wage rates EmpowerMe would have to meet or exceed to entice to entice those employees (and others) to leave Select and accept the same positions with EmpowerMe.   Upon learning of Vazquez's conduct, Select terminated her employment.

60.     Vazquez is currently a Recruiting Specialist at EmpowerMe; as such, her job duties are fundamentally the same as they were in her Staffing Coordinator position at RehabCare/Select. Both roles involve recruiting therapy staff for direct bill facilities.

### E.  Select Puts Painter And Vazquez On Notice To Cease And Desist

---

[5] As with the PRN List, Select does not attach the Compensation Information Vazquez misappropriated, in order to avoid publicizing its trade secrets.

61.     On December 16, 2020, Select's counsel advised Painter in writing that: he was in breach of his Non-Solicitation Agreement; the breach was injuring Select; and he must immediately cease and desist all such solicitations. .

62.     On December 23, 2020, counsel for Painter wrote Select's counsel denying that Painter had solicited employees of Select to leave and stating that they had left of their own accord. He also refused to acknowledge that Painter had ongoing responsibilities under his Non-Solicitation Agreement. As Painter had in fact solicited Select employees and continues to be bound by his Non-Solicitation Agreement, the statements of his counsel are erroneous.

63.     On December 23, 2020, counsel for Select also sent Vazquez a letter demanding that she cease and desist any further misappropriation, use or disclosure of Select's trade secrets and confidential and proprietary information.

64.     On December 24, 2020, counsel for Vazquez in writing denied that Vazquez had any trade secrets, confidential or proprietary information of Select in her possession and further denied that she had any post-employment obligations to Select. As Vazquez possesses Select trade secrets and proprietary and confidential information, as outlined above, and as she has an ongoing duty not to misappropriate or misuse this information, the statements of her counsel are erroneous.

## COUNT I – BREACH OF FIDUCIARY DUTY OF LOYALTY
### (Against Painter)

65.     Select realleges and incorporates paragraphs 1-64 above, as if fully set forth herein.

66.     While RehabCare/Select employed and paid him, Painter owed it a fiduciary duty of loyalty. That duty included the duty to act in Select's best interests, avoid conflicts of interests, refrain from self-dealing, and refrain from actively competing with it.

67.     In breach of his fiduciary duty, Painter actively solicited, Miller, Gruenloh and Vazquez for employment with EmpowerMe.  As set forth above, he was successful as to each, although his success with Miller was temporary.

68.     As a direct and proximate cause of Painter's breach, Select has been damaged in that it lost at least two employees, Gruenloh and Vazquez, in whom RehabCare/Select had invested much specialized training, and who had significant knowledge of its operations and confidential information.

69.     Painter's breach was knowing, willful and wanton.

WHEREFORE, Select  respectfully prays that this Court enter an order in its favor and against Painter:

> (a) awarding Select its actual and compensatory damages in an amount to be determined at trial;
>
> (b) awarding Select punitive and/or exemplary damages in amount to be determined at trial;
>
> (c)  awarding Select its costs in bringing this action;  and
>
> (d)  awarding such other relief in Select's favor as this Court deems just under the circumstances.

## COUNT II - BREACH OF CONTRACT
### (Against Painter)

70.     Select realleges and incorporates paragraphs 1-69 above,  as if fully set forth herein.

71.     The Non-Solicitation Agreement constitutes a binding contract between Painter and RehabCare, supported by adequate consideration, including Painter's bonus eligibility and his continued employment for a period of 14 years post execution.

14

72.     As RehabCare's successor, Select owns and has the right to enforce RehabCare's interests in the Non-Solicitation Agreement, both per paragraph 7 of the Non-Solicitation Agreement and Select's acquisition of RehabCare.

73.     The employee non-solicitation restrictions of paragraph 4(b)(iv) are necessary to protect by RehabCare/Select's legitimate business interests, namely: its interest in a stable managerial workforce; the specialized training given thereto; the confidential information and trade secrets to which its managerial and supervisory employees had access, (including but not limited to the information identified in paragraph 13 above); and its interest in its long-standing customer/facility relationships, for which managerial employees like the Agency Administrators are responsible.

74.     The non-solicitation restrictions of paragraph 4(b)(iv) of the Non-Solicitation Agreement are narrowly tailored to protect those legitimate business interests, in terms of both time and scope.  Indeed, they not only permit Painter to work for a competitor immediately after leaving RehabCare/Select, but also solicit non-managerial and supervisory employees who typically do not have the same level of access to RehabCare/Select's confidential information and trade secrets.  Moreover, Painter is free to solicit even managerial employees one year after his separation.

75.     By soliciting Miller and Gruenloh for employment with EmpowerMe, Painter has breached paragraph 4(b) of the Non-Solicitation Agreement, both during his employment and in the one-year period thereafter.

76.     Painter's solicitation caused Gruenloh's resignation and subsequent employment with EmpowerMe, which directly and proximately caused damage to Select, including the loss of a managerial employee in whom RehabCare/Select had invested much specialized training and

now needs to replace.   It may also cause the loss of additional employees or facilities with whom/which Gruenloh had a relationship by virtue of her employment with RehabCare/Select.

77.     Painter's breach as aforesaid has caused and will cause Select irreparable damage for which it does not have an adequate remedy at law.  Specifically, there is no way for Select to value the losses attendant with Gruenloh's defection to EmpowerMe, whether in terms of the profitability of the facilities for which she was responsible, or the amount of losses that may be caused if she successfully takes Select's employees or facility customers.

78.     The Non-Solicitation Agreement specifically entitles Select to the relief sought herein, including injunctive relief:

> In addition to, and not in lieu of, all other rights and remedies available to RehabCare, RehabCare shall be automatically entitled to a temporary restraining order and a temporary or preliminary injunction and to obtain all other equitable remedies including a permanent injunction in order to restrain and enjoin any breach of the Agreements by Employee [Painter] in Section 3 or 4. The exercise of RehabCare's right to obtain injunctive relief for any actual or threatened damage or injury caused by Employee [Painter] shall not prejudice its right to seek and obtain damages.

(Ex. 1 at ¶4).

WHEREFORE, Select  respectfully prays that this Court:

> (a) enter an order granting a  preliminary and permanent injunction enjoining Painter, and all those acting in concert with him or having notice of this order, from directly or indirectly soliciting or hiring any then-current managerial or supervisory employee of Select for a period of 12 months from the date of the order;
>
> (b)  award Select its actual and compensatory damages in an amount to be determined at trial;
>
> (c)  award Select its costs in bringing this action;  and
>
> (d)  award such other relief in Select's favor as this Court deems just under the circumstances.

16

### COUNT III—VIOLATION OF THE ILLINOIS TRADE SECRETS ACT
(Against All Defendants)

79.     Select realleges and incorporates paragraphs 1-64 above, as if fully set forth herein.

80.     Select's PRN List is sufficiently secret for it to derive actual and potential economic value from it not being generally known to other competitors in its industry, like EmpowerMe in the states of Illinois, Kentucky, Missouri, Kansas, Nebraska, Oklahoma, Georgia and Florida.

81.     Specifically, the PRN List allows Select to quickly identify and contact specific therapy employees who are willing and able to provide the Services at various facilities in Illinois on a per diem basis -- often on short notice and as business needs dictate.  Additionally, the PRN list identifies therapists who are in short supply in rural areas where facilities are more difficult to staff. This list thus enables Select to maintain service levels at its various facilities and ensure that patient care does not lag.

82.     The PRN list also reflects which therapy employees have prior experience at which facilities in Illinois and, therefore, knowledge of and/or relationships with the patients there.  As set forth above, the therapists' knowledge of and relationships with patients is one key to Select's revenue stream.

83.     RehabCare/Select's PRN List takes time, effort and expense to compile and is updated regularly. The PRN List, which includes employees whom RehabCare/Select has employed for more than a decade, is the result of and/or reflects years of considerable recruiting time, effort and expense, including advertising and staffing agency expense, hiring expense (e.g. background checks), onboarding expense and training expense.

84.     The PRN List is not available to the general public or competitors like EmpowerMe, which can also derive significant economic value from it. The PRN list identifies

for EmpowerMe readily available professional employees in Illinois of whom EmpowerMe would otherwise be unaware, and then solicit them for employment.

85.     In doing so, EmpowerMe can harm Select by taking away the professional employees it needs to service its facilities and patients, as well as by using those employees  to gain access to those facilities, patients and revenue streams.

86.     The PRN List also allows EmpowerMe to avoid the time, expense and effort of identifying, evaluating and recruiting prospective professionals in the geographic areas and facilities in which those professionals work.

87.     Similarly, Select's Compensation Information is sufficiently secret for it to derive actual and potential economic value from it not being generally known to other competitors in its industry, like EmpowerMe in the states of Illinois, Kentucky, Missouri, Kansas, Nebraska, Oklahoma, Georgia and Florida.

88.     Specifically, the Compensation Information allows Select to quickly determine its average, minimum and maximum compensation rates across a variety of therapy positions in the eight states listed above and, therefore, set initial and continuing compensation consistently across those markets.   This not only streamlines the hiring process by establishing compensation parameters --which obviates the need to seek time-consuming, internal approvals-- but ensures that Select maintains profitability across these markets by not exceeding established compensation rates or budgets.

89.     The Compensation Information took RehabCare/Select considerable time, effort and expense to compile.

90.     The Compensation Information is not available to the general public or competitors like EmpowerMe, which can also derive significant economic value from it. Specifically, the

18

Compensation List gives EmpowerMe an unfair advantage in competing for Select's existing professional employees, because it gives EmpowerMe the precise compensation rates it needs to match or exceed in order to hire away Select's existing employees within the covered markets. This not only deprives Select of key employees it needs to service its facilities and patients but, through these employees, gives EmpowerMe an entrée into facilities and patients it would not otherwise have.

91.     The Compensation Information also gives EmpowerMe an unfair advantage in hiring new professional employees.

92.     The economic and competitive value of the PRN List and the Compensation Information is evident from the mere fact that Vazquez took pains to surreptitiously take them with her from Select.

93.     RehabCare/Select made reasonable efforts to maintain the secrecy of both the PRN List and the Compensation Information. Such efforts include, but are not limited to: narrowly restricting access to only those who needed them for performance of their job duties; controlling the scope of this information through its document retention policy; providing employee compliance training on maintaining confidentiality; having its employees like Vazquez acknowledge receipt of the confidentiality undertakings contained in its employee handbooks; and having higher-level employees like Painter sign restrictions precluding them from soliciting or hiring employees having access to this information.

94.     The PRN List and Compensation Information therefore qualify as "trade secrets" within the meaning of the Illinois Trade Secrets Act ("ITSA"), 765 ILCS 1065/1 *et seq.* (hereafter, collectively referred to as the "Trade Secrets").

95.     Vazquez actually misappropriated the Trade Secrets within the meaning of section 2 of ITSA by: (1) acquiring them from RehabCare/Select through improper means, i.e. by emailing them to herself on the same day she gave Select notice of her resignation, in contravention of RehabCare/Select's policies and restrictions, and her fiduciary duties while still employed; and (2) disclosing them to herself via email notwithstanding her duty not to maintain their confidentiality.

96.     On information and belief, Vazquez has also disclosed the Trade Secrets to EmpowerMe and/or used them on its behalf to compete with Select.

97.     On information and belief, EmpowerMe, through Painter, induced or encouraged Vazquez to misappropriate the PRN List, as aforesaid, or at least was aware that she did so using improper means.

98.     As Vazquez is engaged in fundamentally the same staffing and recruiting role for EmpowerMe that she was at RehabCare/Select, the threat of her continuing to misappropriate the Trade Secrets by using or disclosing them at EmpowerMe is not only very real and imminent, it is inevitable given her position, responsibilities and EmpowerMe's direct competition with Select.

99.     As a direct and proximate cause of Defendants' misappropriation of its Trade Secrets, Select has been damaged, including but not limited to by being deprived of their exclusive use and the economic value  and competitive advantage attendant with the Trade Secrets, as aforesaid.

WHEREFORE, Select respectfully prays that this Court:

(a) enter an order granting a  preliminary and permanent injunction enjoining Defendants, and all those acting in concert with them or having notice of this order, from directly or indirectly using or disclosing the PRN List, as permitted by 765 ILCS 1065/3;

(b)  enter an order granting a  preliminary and permanent injunction enjoining Vazquez, and all those acting in concert with her or having notice of this order, from directly or indirectly using or disclosing the Compensation Information, as permitted by 765 ILCS 1065/3;

20

(c)  award Select its actual and compensatory damages in an amount to be determined at trial;

(d)  award Select its costs in bringing this action;

(e) award Select compensatory and exemplary damages against Defendants, as permitted by 765 ILCS 1065/4;

(f) award Select its attorney's fees, as permitted by 765 ILCS 1065/5; and

(g)  award such other relief in Select's favor as this Court deems just under the circumstances.

## COUNT IV – VIOLATION OF THE DEFENSE OF TRADE SECRETS ACT
### 18 U.S.C. §1836 *et seq.*
(Against All Defendants)

100.    Select realleges and incorporates paragraphs 79-99 above, as if fully set forth herein.

101.    The Trade Secrets also qualify as a trade secret within the meaning of the Defense of Trade Secrets Act, 18 U.S.C §1836 *et seq*. ("DTSA").

102.    RehabCare/Select has taken reasonable measures to protect and maintained the secrecy of its Trade Secrets, as aforesaid.

103.    The Trade Secrets are not generally known in the industry and are not generally ascertainable by proper means.

104.    Select derives actual and potential economic value from its Trade Secrets.

105.    Select's Trade Secrets are related to a service used in or intended to be used in interstate commerce.

106.    Vazquez knowingly acquired Select's Trade Secrets through improper means.

107.    On information and belief, Vazquez has also disclosed the Trade Secrets to EmpowerMe and/or used them on its behalf to compete with Select in the eight referenced states.

108.    On information and belief, EmpowerMe, through Painter, induced or encouraged Vazquez to misappropriate the PRN List as aforesaid or at least was aware that she did so using improper means.

109.    As Vazquez is engaged in fundamentally the same staffing and recruiting role for EmpowerMe that she was at RehabCare/Select, the threat of her continuing to misappropriate the Trade Secrets through use or disclosure is not only very real and imminent, it is inevitable given her position, responsibilities and EmpowerMe's direct competition with Select.

110.    As a direct and proximate cause of Defendants' misappropriation of its Trade Secrets, Select has been damaged, including but not limited to by being deprived of their exclusive use and the economic value  and competitive advantage attendant with the Trade Secrets confer, as aforesaid.

WHEREFORE, Select respectfully prays that this Court:

(a) enter an order granting a  preliminary and permanent injunction enjoining Defendants, and all those acting in concert with them or having notice of this order, from directly or indirectly using or disclosing the PRN List, as permitted by 18 U.S.C §1836 *et seq*.;

(b) enter an order granting a  preliminary and permanent injunction enjoining Vazquez, and all those acting in concert with her or having notice of this order, from directly or indirectly using or disclosing the Compensation Information, as permitted by 18 U.S.C §1836 *et seq*.;

(c)  award Select its actual and compensatory damages in an amount to be determined at trial;

(d)  award Select its costs in bringing this action;

(e) award Select compensatory and exemplary damages against Defendants, as permitted by as permitted by 18 U.S.C. §1836 *et seq*.;

(f) award Select its attorney's fees, as permitted by 18 U.S.C §1836 *et seq.;*

(g)  award such other relief in Select's favor as this Court deems just under the circumstances.

22

### COUNT V—VIOLATION OF THE COMPUTER FRAUD AND ABUSE ACT
### 18 U.S.C.§ 1030 et seq.
(Against Vazquez)

111.    Select realleges and incorporates paragraphs 1-64 above,  as if fully set forth herein.

112.    Vazquez intentionally accessed Select's computer systems to download/transfer its Trade Secrets from Select's computer systems to her personal email addresses.

113.    Vazquez exceeded her authority in accessing Select's computer system for the purpose of downloading/transferring the Trade Secrets for her and/or EmpowerMe's competitive use. Specifically, Vazquez's access to the Trade Secrets for this purpose flagrantly violated numerous express prohibitions set forth in RehabCare/Select's policies, described above.

114.    Vazquez in fact obtained data from Select's computer system through her unlawful acts, as aforesaid.

115.    Select lost more than $5,000 in business as a direct and proximate result of Vazquez's unauthorized use of Select's computer system.

WHEREFORE, Select prays that this Court:

(a) enter an order granting a  preliminary and permanent injunction enjoining Defendants, and all those acting in concert with them or having notice of this order, from directly or indirectly using or disclosing any of the Trade Secrets obtained through Vazquez's violations of the Computer Fraud and Abuse Act;

(b) award Select its actual losses proximately caused by Vazquez's violation of the Computer Fraud and Abuse Act, including compensatory damages and attorneys' fees in an amount to be determined at trial;

(c)  award Select its costs in bringing this action;  and

(d)  award such other relief in Select's favor as this Court deems just under the circumstances.

## COUNT VI—TORTIOUS INTERFERENCE WITH CONTRACT

(Against EmpowerMe)

116.    Select realleges and incorporates paragraphs 1-78 above, as if fully set forth herein.

117.    Select had a valid contract with Painter, as aforesaid.

118.    On information and belief, at all relevant times EmpowerMe was aware of the nature and terms of RehabCare/Select's contract with Painter, including his continuing non-solicitation obligations.

119.    On information and belief, EmpowerMe, intentionally, wrongfully and without privilege interfered with RehabCare/Select's contract with Painter by encouraging and/or inducing him to solicit Select's existing managerial and/or supervisory employees,  Gruenloh and Miller, in contravention of his contractual obligations, both while still employed by RehabCare/Select and thereafter.

120.    RehabCare/Select has been injured as a direct result of EmpowerMe's  interference with its contract with Painter, including but not limited to the loss of Gruenloh and its investment therein.

WHEREFORE, SELECT prays that this Court enter judgment in Select's favor and against EmpowerMe:

(a)    awarding Select its actual and compensatory damages;

(b)    awarding Select punitive and/or exemplary damages;

(c)    awarding Select its costs; and

(d)    granting Select such other relief as this Court deems just in its favor.

## COUNT VII- INDUCING/AIDING/ABETTING BREACH OF FIDUCIARY DUTY
(Against EmpowerMe)

121.    Select realleges and incorporates paragraphs 1-78 above, as if fully set forth herein.

24

122.    As alleged above, Painter is liable for his breach of his individual duty of loyalty to RehabCare/Select.

123.    At all relevant times, EmpowerMe was aware of Painter's fiduciary duty of loyalty to RehabCare/Select.

124.    Notwithstanding that awareness, EmpowerMe induced, aided and/or abetted Painter's breach of fiduciary duty by encouraging and/or authorizing his solicitation of RehabCare/Select employees while he was still employed thereby.

125.    As a direct and proximate cause of EmpowerMe's conduct, Painter breached his fiduciary duty to Select as aforesaid, causing Select damages, including but not limited the loss of Gruenloh and Vazquez and RehabCare/Select's investment therein.

WHEREFORE, SELECT prays that this Court enter judgment in Select's favor and against EmpowerMe:

(a)    awarding Select its actual and compensatory damages;

(b)    awarding Select punitive and/or exemplary damages;

(c)    awarding Select its costs; and

(d)    granting Select such other relief as this Court deems just in its favor.

[*Remainder of page intentionally left blank.*]

25

SELECT REHABILITATION, LLC

Dated: March 9, 2021                    By:/s/ William J. McKenna

                                       Diane Gianos Walker (pro hac pending)
                                         Robert H. Smeltzer (pro hac pending)
  Kristen Wolfe Roberts (pro hac pending)
  WALKER MORTON LLP
  Two Prudential Plaza
  180 North Stetson Avenue, 47th Floor
  Chicago, IL 60601
  Telephone: (312) 471-2900
  Facsimile: (312) 471-6017
  dwalker@walkermortonllp.com
  rsmeltzer@walkermortonllp.com
  kroberts@walkermortonllp.com

  and


  William J. McKenna, Jr.
  David B. Goroff (pro hac pending)
  FOLEY & LARDNER LLP
  321 N. Clark Street, Suite 3000
  Chicago, IL  60654
  Telephone:  (312) 832-4500
  Facsimile:  (312) 832.4700
  wmckenna@foley.com
  dgoroff@foley.com

  *Attorneys for Select Rehabilitation, LLC*

## <u>VERIFICATION</u>

Pursuant to 28 U.S.C. § 1746 and under penalties of perjury, we the undersigned state

that the foregoing factual allegations are true and correct, except as to matters stated on

information and belief, and as to such matters we state that we verily believe the same to be true

to the best of our respective knowledge, information and belief.

SELECT REHABILITATION, LLC

By: _____

Glenda Mack, Executive Vice
President

By: _____

Stefanie Pennington, Vice President,
Recruitment

By: _____

Sherrie Sharp, DVP

Executed on: March 9, 2021